

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-22-2004

# Asplundh Tree Expert v. NLRB

Precedential or Non-Precedential: Precedential

Docket No. 02-1151

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Asplundh Tree Expert v. NLRB" (2004). *2004 Decisions.* Paper 742.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/742

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

Nos. 02-1151/1543

_____


ASPLUNDH TREE EXPERT COMPANY,

Petitioner  No. 02-1151

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent


_____


NATIONAL LABOR RELATIONS BOARD,

Petitioner  No. 02-1543

v.

ASPLUNDH TREE EXPERT COMPANY,

Respondent

_____

Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board Proceeding 9-CA-360005

_____

Argued: November 8, 2002

Before: McKEE and GREENBERG, Circuit Judges, and LIFLAND, District Judge[*]


(Opinion filed: April 22, 2004)

_____


STEVEN R. SEMLER, ESQ.  (Argued)

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

2400 N Street, NW

Washington, D.C. 20037

Attorneys for Asplundh Tree Expert Company


ARTHUR R. ROSENFELD, ESQ.

General Counsel, National Labor Relations Board

JOHN E. HIGGINS, JR., ESQ.

Deputy General Counsel

JOHN H. FERGUSON, ESQ.

Associate General Counsel

AILEEN A. ARMSTRONG, ESQ.

Deputy Associate General Counsel

CHARLES DONNELLY, ESQ.

Supervisory Attorney

_____


[*]The Hon. John C. Lifland, District Judge of the United States District Court for the District of New Jersey, sitting by designation.

JOHN R. McINTYRE, ESQ. (Argued)

Attorney

National Labor Relations Board

1009 14th Street, NW

Washington, D.C. 20570

Attorneys for National Labor Relations Board

---

OPINION

---

McKEE, Circuit Judge.

Asplundh Tree Expert Company petitions for review of a decision of the National Labor Relations Board ("NLRB" or "Board") wherein the NLRB ruled that Asplundh committed unfair labor practices by threatening to lay off Dennis Brinson and by discharging Brinson and Eric Crabtree in response to their concerted complaint about working conditions while on temporary work assignment in Ottawa, Canada. Those employees also briefly withheld their services in support of their job related complaints. The Board has cross-applied for enforcement of its order. However, we hold that since the National Labor Relations Act ("NLRA") does not apply outside the territorial jurisdiction of the United States, the Board did not have jurisdiction over the unfair labor practices charge. Accordingly, we will vacate the Board's decision.

## I. FACTS

Asplundh provides tree trimming services throughout the eastern United States and maintains its principal place of business in Willow Grove, Pennsylvania. Much of Asplundh's work is performed for utility companies that need to keep their power lines cleared of tree limbs. One of Asplundh's operations is based in Cincinnati, Ohio, where it primarily performs line clearance work for the Cincinnati Gas & Electric Company. Asplundh's employees are represented by Local 171 of the International Brotherhood of Electrical Workers ("IBEW"). A collective bargaining agreement between Asplundh and IBEW covers Asplundh's workers when they are engaged in line clearance work on the property of Cincinnati Gas & Electric Company or its subsidiaries.

Asplundh also offers its services to utilities and other entities in other states. In that capacity, it assigns its employees to perform work related to storms, natural disasters and natural emergencies. Several provincial governments in Canada retained Asplundh to assist in clearing electrical lines, trimming tree limbs and cleaning streets after a major ice storm struck eastern Canada in January 1998. Ottawa, Ontario was among the entities that contracted for Asplundh's services following that storm, and on January 12,

Asplundh's Cincinnati operation prepared to send 10 crews of 2 employees each to that Canadian city.

Asplundh does not require its employees to travel outside of their locality for emergency storm cleanup work like the Ottawa assignment. Instead, employees volunteer for such work, and are compensated in part by a per diem covering their food and lodging while working away from home.

On January 13, a group of 20 employees met in a parking lot before leaving for Ottawa. At the meeting, Supervisor Darrell Lewis told the employees that they would receive per diem payments in the amount of $25 for food and that Asplundh would pay up to $75 per day for hotel rooms.[1]

The group left for Ottawa later that day in a caravan of Aslpundh trucks. Lewis did not travel to Ottawa, and Foreman Ronald Lacey was therefore left in charge of the assignment. On the 31 hour trip to Ottawa, the employees did not take any breaks lasting longer than 3 hours. They also experienced a number of problems including malfunctioning heaters and taillights. Several crews became lost when they were unable to keep pace with Lacey, who was leading the caravan. Some employees received no per diem or food money for the uninterrupted travel time. By the time the employees arrived in Ottawa on the evening of January 14, many of them were hungry, fatigued and disgruntled.

Once in Ottawa, Lacey reserved hotel rooms for all of the employees which he paid for at a negotiated price of $61 per room per night. That rate was obviously less than the $75 per night Lewis had told the employees was available for their lodging. Concomitantly, some of the employees began to feel that the $25 per diem for food was insufficient to cover the high cost of food in Ottawa.

At least four employees – Brinson, Crabtree, Shane Duff and Ron Noble – met on the first night in Ottawa and discussed their dissatisfaction with the problems they had encountered en route as well as the amount of their per diem. They discussed augmenting the per diem with the $14 remaining from the difference between the $75 that Asplundh was willing to spend per hotel room and the $61 that Lacey was actually paying. They agreed that they should discuss the matter with Lacey and decided that Brinson would be the spokesperson.

On January 15 and 16, the cleanup crews worked 12-hour days without incident. However, at some point during that period, Duff obtained the hotel phone number of his brother, Mike Gilbert, who was working in Quebec for Asplundh on another storm cleanup assignment. Gilbert

---

[1] Some employees understood Lewis to have said they would get up to $75 a night for motel expenses; however, Lewis testified before the ALJ that he told them that Asplundh could pay up to $75 a day for their rooms, and the NLRB apparently accepted that testimony as credible.

and Duff spoke numerous times during the course of those two days. They compared notes and concluded that Asplundh employees on assignment in Quebec were better off than Asplundh employees in Ottawa. For example, Gilbert told Duff that the Quebec crew's supervisor paid for all of their food and phone calls, and occasionally even treated employees to steak dinners. Brinson also talked to Gilbert and told co-workers Crabtree and Noble about the circumstances of the workers in Quebec. After hearing about this disparity, the Ottawa crew decided to confront Lacey and request a larger per diem.

On the morning of January 17, Brinson phoned Lacey and told him that the employees wanted a $14 increase in their per diem payments – the difference between the $75 authorized for hotel rooms and the actual $61 room cost. Brinson also indicated that the employees might not work if their per diem payments were not increased. Lacey then called Cincinnati and spoke with Lewis, the supervisor. Lacey told Lewis of the employees' request and of the possibility that they might not work if their concerns were not addressed. Lewis instructed Lacey not to raise the per diem payments and told Lacey that "if they're not going to take the trucks out, that means they quit."

Lacey went to the hotel lobby to meet with the employees, placed another call to Lewis, then handed Brinson the phone. Lewis told Brinson that the employees were "whiny cry babies" and were "making the Company look bad." Lewis then told Brinson that a number of crews would be laid off when they returned to Cincinnati and that the Ottawa employees were making it easier for Lewis to decide whom to lay off.

Brinson relayed his conversation with Lewis to a group of crew members, told them it was time to decide what they wanted to do, and then left to let them make a decision. A short time later, Brinson realized that most of the crew members had left to go to their work assignment.

Lacey then approached Brinson, who was standing with Crabtree, Duff and Noble, and asked them what they were going to do. Brinson replied that they still wanted to discuss their situation before going to work. Lacey responded by demanding Brinson's truck keys. After Brinson handed over his keys, Lacey asked Crabtree what he wanted to do. Crabtree replied: "I'm with Dennis [Brinson]. I still think we need to have something done about this." Lacey then asked Crabtree for his keys, and after Crabtree gave them to Lacey, Lacey said "this means you quit." Lacey also admonished Brinson and Crabtree for sticking up for their fellow employees and then told them to "get home the best way you f...g can." Duff and Noble briefly considered joining Brinson and Crabtree in their refusal to work, but Brinson, concerned about Duff's and Noble's job security, convinced them that they ought to go to work.

Soon thereafter, Brinson and

Crabtree returned to Cincinnati by bus. Once back in Cincinnati, Brinson repeatedly offered to return to work, but neither he nor Crabtree were ever allowed to return to their jobs with Asplundh.[2]

## II. PROCEDURAL HISTORY

On May 29, 1998, Brinson filed a charge with the Board alleging that Asplundh "discharged its employees Dennis Brinson and Paul Eric Crabtree because of their protected, concerted activities." App. at 419. On January 22, the General Counsel issued a complaint and hearings were thereafter held before an administrative law judge. The ALJ ruled that Asplundh had engaged in unfair labor practices, in violation of § 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1),[3] by

threatening Brinson with layoff because of his concerted activity and by discharging Brinson and Crabtree for engaging in that same activity.

Asplundh filed exceptions to the ALJ's decision. On November 30, 2001, the Board affirmed the ALJ's decision. It ordered Asplundh to cease and desist from engaging in unfair labor practices and from interfering with employees in the exercise of the rights guaranteed by § 7 of the NLRA, 29 U.S.C. § 157. The Board also ordered Asplundh to reinstate Brinson and Crabtree, make them whole, remove any reference to improper conduct from their personnel files, and post a remedial notice at its Cincinnati location.

Asplundh's petition for review and the Board's a cross-application for enforcement followed.

## III. DISCUSSION

Asplundh argues that the Board's

[2]The Board and Asplundh agree that because the collective bargaining agreement between IBEW Local 171 and Asplundh was limited to work on the property of Cincinnati Gas & Electric Company and its subsidiaries, Local 171 was not the employees' exclusive representative for the purposes of employment in Ottawa.

[3]Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise" of the rights guaranteed in Section 7 of the NLRA, 29 U.S.C. § 157. Section 7, in turn, guarantees employees the right to engage in "concerted activities" not only for self-organization, but also "for the purpose of

. . . mutual aid or protection. . . ." The "mutual aid or protection" clause of § 7 protects employees' concerted activity that relates to their terms and conditions of employment, whether or not they are engaged in union related activity. *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 14 (1962). Section 8(a)(1) also makes it in unfair labor practice for an employer to discharge an employee in response to the employee's participation in protected, concerted activity. *Tri-State Trucking Serv., Inc. v. NLRB*, 616 F.2d 65, 69 (3d Cir. 1980).

finding of violations of § 8(a)(1) of the NLRA was not supported by substantial evidence. However, we must first resolve Asplundh's challenge to the Board's exercise of jurisdiction over an unfair labor practices charge arising from "offending" conduct that occurred in Canada.[4]

Although Congress undoubtedly has the authority "to enforce its laws beyond the territorial boundaries of the United States[,] . . . [w]hether Congress has in fact exercised that authority . . . is a matter of statutory construction." *EEOC v. Arabian American Oil Co.*, ("*ARAMCO*"), 499 U.S. 244, 248 (1991) (citations omitted).[5] Moreover, "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)).

> This canon of construction is a valid approach whereby unexpressed congressional intent may be ascertained. It serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.

> In applying this rule of construction, we look to see whether language in the relevant Act gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control. We assume that Congress legislates against the backdrop of the

---

[4]Asplundh argued before the ALJ and the Board, that because the conduct giving rise to the unfair labor practices charge occurred outside the United States, the Board did not have jurisdiction. Both the ALJ and the Board rejected Asplundh's argument. However, we owe no deference to the NLRB's view because the extraterritorial application of a statute is purely a matter of statutory construction not involving agency expertise. *Cleary v. United States Lines, Inc.*, 728 F.2d 607, 610 n.6 (3d Cir. 1984).

[5]In *ARAMCO*, the Supreme Court held that protections against employment discrimination of Title VII of the Civil Rights Act of 1964 did not extend extraterritorially to protect United States citizens employed abroad by United States employers. 499 U.S. at 248-59.

However, in the wake of ARAMCO, Congress amended Title VII to protect United States citizens employed abroad by United States employers. *Spector v. Norwegian Cruise Line Ltd.*, 356 F.3d 641, 646 n.4 (5th Cir. 2004) (citing 42 U.S.C. § 2000e(f) (2000)).

presumption against extraterritoriality. Therefore, unless there is the affirmative intention of the Congress clearly expressed, we must presume it is primarily concerned with domestic conditions.

*ARAMCO*, 499 U.S. at 248 (citations, internal quotations, ellipses and brackets omitted).

Asplundh bases its argument that the Board lacked jurisdiction over the unfair labor practices charge largely upon the presumption against extraterritoriality which the Court explained in *ARAMCO*. The Board acknowledges this presumption against extraterritoriality. Indeed, the Board, has applied the jurisdictional test of *ARAMCO* in holding that the NLRA does not apply abroad. *See, e.g., Computer Sciences Raytheon*, 318 NLRB 966, 968 (1995). Nonetheless, the Board now contends that the assumption of jurisdiction over the unfair labor practices charge at issue here is "entirely compatible" with the presumption against extraterritoriality. Board's Br. at 22.

In the Board's view, it is appropriate for it to assume jurisdiction when a United States citizen is working on a short-time, temporary assignment outside the United States, with the clear expectation of returning to the United States upon completion of the assignment.[6] This argument is not without some force and certainly appears consistent with the labor policy endemic in the NLRA. However, as noted above, our task is one of statutory interpretation. Accordingly, sound policy positions advocated by either side neither constrain nor influence our inquiry. *See ARAMCO*, 499 U.S. at 248.

As *ARAMCO* teaches, we begin our analysis with the language of the NLRA. Section 10 of that Act provides that "[t]he Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce." 29 U.S.C. § 160(a). Admittedly, the NLRA defines the jurisdictional terms "affecting commerce" and "commerce" very broadly.

---

[6]In its brief, the Board cites to *December 12, Inc.*, 273 NLRB 1 (1984), *enf'd*, 772 F.2d 912 (9th Cir. 1985), in which it held that it was appropriate for it to assert jurisdiction over a United States employer and its United States employee, ordinarily stationed in the United States, who was discharged for engaging in protected activity while on a temporary assignment in Australia. In asserting jurisdiction, the Board noted that the fact that the "activities occurred outside the United States did not render them any less protected." *Id.* at 5 n.11. However, *December 12* was decided before ARAMCO. Moreover, the unlawful discharge in *December 12* occurred in the United States, not in Australia.

"'[A]ffecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 U.S.C. § 152 (7). Similarly, the NLRA broadly defines "commerce" as:

> trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or *between any foreign country* and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

29 U.S.C. § 152(6) (1988) (emphasis added).

Thus, a literal reading of the jurisdictional and definitional provisions of the NLRA seems to not only favor the NLRB's extraterritorial exercise of jurisdiction, it seems to dictate that result and end our jurisdictional inquiry. However, in interpreting this seemingly broad language, we are not free to ignore the Supreme Court's interpretation of the similarly broad jurisdictional reach of Title VII in *ARAMCO*. Title VII then stated that "[a]n employer is subject to Title VII if it has employed 15 or more employees . . . and is engaged in an industry affecting commerce." *ARAMCO*, 499 U.S. at 249. "An industry affecting commerce" was defined as "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry 'affecting commerce' within the meaning of the Labor-Management Reporting and Disclosure Act of 1959. . ." . *Id*. "Commerce," in turn, was defined as "trade, traffic, commerce, transportation, transmission, or communication among the several States; or *between a State and any place outside thereof*; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof." *Id*. (internal quotation marks omitted) (emphasis added).

The petitioners in *ARAMCO* argued that the broad definition of "employer" and "commerce" in Title VII reflected Congress' intent to give the EEOC extraterritorial jurisdiction. *ARAMCO*, 499 U.S. at 251. The Court rejected that argument reasoning that such broad jurisdictional terms were nothing more than "boilerplate language" that Congress had used in numerous other enactments. The Court held that such "boilerplate" was simply not enough to defeat the presumption against the extraterritorial application of Title VII. *Id*. (cited statutes

8

omitted). In doing so, the Court reiterated, "we have repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *Id*., at 251. (emphasis in original).[7]

The Court held that the wording of Title VII was not sufficient to rebut the presumption against extraterritoriality and

---

[7] The Court specifically cited *New York Central R. Co. v. Chisholm,* 268 U.S. 29, (1925), wherein it had addressed the extraterritorial application of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.* "FELA provides that common carriers by railroad while engaging in 'interstate or foreign commerce' or commerce between 'any of the States or territories and any foreign nation or nations' shall be liable in damages to its employees who suffer injuries resulting from their employment. § 51." 499 U.S. at 251. "Despite this broad jurisdictional language," the Court "found that the Act 'contains no words which definitely disclose an intention to give it extraterritorial effect[.]" *ARAMCO*, 499 U.S. at 251 (citing *Chisholm,* 268 at 31). Thus, despite Congress's reference to "interstate or foreign commerce," the Court in *Chisolm*, concluded that "there was no jurisdiction under FELA for a damages action by a United States citizen employed on a United States railroad who suffered fatal injuries at a point 30 miles north of the United States border into Canada." *Id*.

support a conclusion that Congress intended to empower the Equal Employment Opportunity Commission to exercise jurisdiction beyond the United States, despite the broad definitions suggesting the contrary. The Court buttressed reliance on presumption against extraterritorial jurisdiction by noting that Congress had not included any mechanism for the extraterritorial enforcement of the Act's protections. The Court reasoned:

> [t]his conclusion is fortified by other factors suggesting a purely domestic focus, including Title VII's failure even to mention foreign nations or proceedings despite a number of provisions indicating a concern that the sovereignty and laws of States not be unduly interfered with, and the Act's failure to provide any mechanisms for its overseas enforcement. It is also reasonable to conclude that had Congress intended Title VII to apply overseas, it would have addressed the subject of conflicts with foreign laws and procedures, as it did in amending the Age Discrimination in Employment Act of 1967 (ADEA) to apply abroad.

499 U.S. at 245. Similarly, in enacting the

9

NLRA, Congress included no mechanism for extraterritorial enforcement, and did not provide a method for resolving any conflicts with labor laws of other nations. Given the obvious potential for conflict where United States companies employ workers oversees, this omission strikes us as more than a mere oversight. It is consistent with the Supreme Court's conclusion that broad definitional language is little more than "boilerplate" in the absence of an express manifestation of extraterritorial intent.[8]

Therefore, absent more, we can not interpret the "boilerplate language" before us in the NLRA in a manner that would inject the expression of congressional intent required to stretch it to cover the employees Asplundh temporarily detailed to Canada. Moreover, the Board is not able to point to any language in the NLRA that would support its position given the rationale of *ARAMCO*. In fact, the Board seems to completely ignore the fact that we are confronted with an issue of statutory construction rather than policy. Instead, the Board advances a number of reasons why the NLRA *should* apply to United States citizens working temporarily abroad. Although we are sympathetic to the argument that the NLRA *should* apply abroad under the circumstances here, we must determine if the NLRA *does* apply abroad. As noted above, that is an inquiry governed by statutory construction as guided by Supreme Court precedent; it is not an inquiry governed by the kind of policy considerations the NLRB urges upon us.

The NLRB contends that its assertion of jurisdiction was appropriate for three reasons. First, the unfair labor practices charge "involves an employment relationship that has been shown to be primarily within the territorial boundaries of the United States."[9] Board's Br. at 22.

---

[8] We realize, of course, that the world's economies are exponentially more tightly interwoven today than when the NLRA was first enacted. However, this does not negate our view of the significance of the omission of any mechanism for resolving conflicts with foreign laws or enforcing the protections of the NLRA abroad.

[9] To support this assertion, the Board cites to its findings in the administrative proceedings that

> Brinson and Crabtree are Americans who were employed by an American employer in the United States and who performed their regular work in the United States. Their assignment in Canada was both brief and temporary. While in Canada they were supervised by an American supervisor. Moreover, the results of [Asplundh's] conduct were principally felt in the United States. Thus, [Asplundh] did not simply replace Brinson and

Second, its "remedial order has no extraterritorial reach, as it will only require a U.S. employer to take action – namely, reinstatement, backpay and a notice posting – in the United States."[10] *Id.* at 23. Third, "failure to assert jurisdiction would not only deny Brinson and Crabtree relief to which they would otherwise unquestionably be entitled;" it would also frustrate the remedial and deterrent purposes of the NLRA. *Id.* Accordingly, the Board argues that it was reasonable for it to assume jurisdiction over the unfair labor practices charge because the "fact that Brinson and Crabtree were briefly in Canada. . . when they staged their short-lived protest was little more than a fortuity for U.S. workers employed by a U.S. enterprise." *Id.*

We do not disagree that the

---

Crabtree on their Canadian assignment, but instead . . . effectively fired them from their jobs in the United States.

App. at 2.

[10]In its decision the Board noted that because its remedial order only affects a United States employer "there is no danger that an assertion of jurisdiction will lead to a conflict between the labor laws of the United States and Canada or otherwise interfere with foreign relations." App. at 2.

Board's exercise of jurisdiction can be seen as "reasonable," however, that is not tantamount to determining if it was authorized. As noted above, given the Court's holding in *ARAMCO*, the language of the NLRA simply can not be read as an expression of the congressional intent required to empower the Board to exercise jurisdiction over Asplundh's conduct here.

Moreover, although the Board's argument to the contrary has significant appeal at first blush, we believe the Board's "policy" argument is nothing more than a "balancing of contacts" test that the Supreme Court has already rejected in a case it decided before *ARAMCO*.

In *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963), an American corporation, United Fruit, was the beneficial owner of a number of cargo vessels which made regular sailings between the United States, Latin America and other ports transporting the American corporation's products. *Id.* at 12. Each vessel was legally owned by a foreign subsidiary of the American corporation, flew the flag of a foreign nation, carried a foreign crew and had other contacts with the nation of its flag. *Id.* A portion of United Fruit's fleet of beneficially owned vessels consisted of vessels legally owned by Empresa Hondurena de Vapores, a Honduran corporation. *Id.* at 13. However, all of the stock of that Honduran corporation was owned by United Fruit. *Id.* The crews on the vessels were recruited by Empresa Hondurena in Honduras and all of the

11

crewmen were Honduran citizens who claimed Honduras as their residence and home port with the exception of one Jamaican. *Id.* The crew's wages, terms and conditions of employment, etc., were controlled by a bargaining agreement between Empresa Hondurena and a Honduran union, Sociedad Nacional de Marineros de Honduras. The agreement was governed by Honduran labor law. *Id.* at 14.

However, United Fruit, the parent corporation of Empresa Hondurena, determined the ports of call of the vessels, their cargoes and sailings, and integrated the Honduran vessels into its broader fleet organization. The Honduran vessels made regular and periodic stops at various ports between Central and South America as well as ports in the United States. *Id.*

An American maritime union, the National Maritime Union of America, AFL-CIO, filed a petition seeking certification as the representative of the crewmen employed on certain of the Honduran vessels. *Id.* at 13. The NLRB granted the union's petition for certification, asserting jurisdiction based on its finding that the vessels' "maritime operations involved substantial United States contacts, outweighing the numerous foreign contacts present." *Id.* at 14-15. Sociedad, the Honduran union, responded by seeking an injunction to prevent the regional director of the NLRB from holding an election,[11] *id.* at 15-16, and the district court granted the Honduran union's request for relief. *Id.*

There, as here, the inquiry turned on "the coverage of the National Labor Relations Act." 372 U.S. at 12. The question before the Court was "whether the Act extends to the crews engaged in such a maritime operation." *Id.* Both sides agreed that Congress had the power to extend the coverage of the NLRA to "crews working foreign-flag ships, at least while they were in American waters[]." *Id.*, at 17. The question was "whether Congress had exercised that power." *Id.* For the purposes of our inquiry, it is important to note the test the NLRB had used to determine its jurisdiction over the petition for certification. That was a "balancing of contacts" test that the Board had developed in determining jurisdiction in other cases involving the NLRA's application to foreign-flag ships and their crews. *Id.* at 15, 19. Simply put, under that balancing test, if the Board found that

<hr>

[11]The Sociedad filed suit in the District of Columbia district court. However, Empresa also filed two suits in a New York district court, which denied relief to Empresa. The Court of Appeals for the Second Circuit reversed the district court. All three actions were consolidated in the Supreme Court and, for appellate jurisdictional reasons not necessary to recite, the Supreme Court chose the Sociedad's case as the proper "vehicle for . . . adjudication on the merits." 372 U.S. at 16.

the American contacts in the dispute were substantial, it asserted jurisdiction under the NLRA; however, if it found that the foreign contacts outweighed the American contacts, the Board concluded the NLRA did not apply and would not assert jurisdiction. *Id.* at 17-18.

The Court began its review of the injunction noting the "question of application of laws of the United States to foreign-flag ships and their crews has arisen often and in various contexts." *Id.* at 17. It next noted that using the Board's "balancing of contacts" test to determine jurisdiction

> might require that the Board inquire into the internal discipline and order of all foreign vessels calling at American ports. Such activity would raise considerable disturbance not only in the field of maritime law but in our international relations as well. In addition, enforcement of Board orders would project the courts into application of the sanctions of the Act to foreign-flag ships on a purely ad hoc weighing of contacts basis. This would inevitably lead to embarrassment in foreign affairs and be entirely infeasible in actual practice.

*Id.* at 19. Consequently, the Supreme Court rejected the Board's "balancing of contacts" test and concluded that the question before it was "more basic; namely, whether the Act *as written* was intended to have any application to foreign registered vessels employing alien seamen." *Id.* (emphasis added). In other words, the inquiry turned on statutory construction rather than an analysis of the comparative impact the Board's exercise of jurisdiction would have on the jurisdictions potentially affected by the underlying dispute or the Board's action.[12]

---

[12] In *ARAMCO*, the Court specifically referred to *McCulloch*, writing:

> [I]n *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963), we addressed whether Congress intended the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-168, to apply overseas. Even though the NLRA contained broad language that referred by its terms to foreign commerce, § 152(6), this Court refused to find a congressional intent to apply the statute abroad because there was not "any specific language" in the Act reflecting congressional intent to do so.

After examining the language in the NLRA, the Court concluded "that the jurisdictional provisions of the Act do not extend to maritime operations of foreign-flag ships employing alien seamen." *Id.* at 13.

Thus, after *McCulloch*, the Board's "balancing of contacts" cannot be used to manufacture jurisdiction in the absence of clearly expressed congressional intent to extend the NLRA to United States citizens temporarily working abroad for a United States employer. Perhaps realizing this, the Board attempts to craft a new jurisdictional test to justify its assertion of jurisdiction here. It argues that the employee's "work station" determines whether the NLRA applies. According to the Board, Brinson's and Crabtree's "work station" was the United States. The Board argues:

> Brinson, who lives in southern Ohio, had been employed by [Asplundh] in the Cincinnati area for 8 years prior to his termination. He had never worked for [Asplundh] outside of greater Cincinnati. Like Brinson, Crabtree was also a southern Ohio resident. In over 12 years with [Asplundh], Crabtree had worked outside of southern Ohio only once prior to his termination, and that was on a brief emergency assignment within the United States. The Ottawa assignment during which the pair were discharged was scheduled to last for only about 2 weeks, at the end of which the employees were to return to their permanent employment base in the Cincinnati area. Thus . . . , Brinson and Crabtree maintained work stations in the United States, as their employment was based in the United States, and not in Canada.

Board's Br. at 27-28. The Board claims that the major advantage of its new "work station" theory is that the assertion of jurisdiction under the test has no extraterritorial effect because the permanent "work station" remained the United States.

However, the Board's "work station" rule also spawns a policy driven analysis at the expense of one driven by statutory interpretation. Adopting the Board's "work station" inquiry also requires an examination of the specific impact of the extraterritorial application to the acts in question. Nothing in *McCulloch* suggests that such a case by

*ARAMCO*, 499 U.S. at 251-52 (citing *McCulloch*, 372 U.S. at 19).

case inquiry can overcome the presumption against extraterritoriality in the absence of express jurisdictional language. *Spector v Norwegian Cruise Line*, *Ltd*., 356 F.3d 641, 648 n.8 ("*McCulloch* did not examine individual applications of the NLRA to reach its result. Instead, the Court pointed to the prospective conflict that would result. . . . This impending conflict exemplified the strong basis for its canon of construction mandating a clear congressional intent.").

Moreover, the Board has cited no authority to support its claim that a "work station" rule even exists under the NLRA. Rather, the cases the Board relies upon in urging that we adopt a "work station" analysis arise under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623(f)(1), (g)(1). *See* Board's Br. at 26-27 (citing *Pfeiffer v. Wm. Wrigley Jr. Co.*, 755 F.2d 554 (7th Cir. 1985); *Cleary v. United States Lines*, 728 F.2d 607 (3d Cir. 1984); *Wolf v. J. I. Case Co.*, 617 F.Supp. 858 (E.D. Wis. 1995); *Lopez v. Pan Am World Servs., Inc.*, 813 F.2d 1118 (11th Cir. 1987)). Furthermore, the Board has failed to fully analyze the foundations of the ADEA's "work station" rule. We noted in *Cleary v. United States Lines*, 728 F.2d 607, 713 (3d Cir. 1984), that ADEA § 626(b), prior to its amendment in 1984, incorporated the extraterritorial exemption of the Fair Labor Standards Act's § 13(f), 29 U.S.C. § 213(f), which specifically barred jurisdiction of the ADEA "with respect to any employee whose services during the work week are performed in a *workplace* within a foreign

country." (emphasis added).[13]

Ironically, although the Board seeks to import the ADEA's workplace exemption into the NLRA, that exemption was applied to deny extraterritorial application of the ADEA in each ADEA case the Board relies upon here.

Finally, we are mindful of the fact that Congress knows how to provide for extraterritorial application of its enactments when it intends them to operate outside of the United States. For example in 1984, after a number of courts of appeals held that the ADEA did not operate extraterritorially,[14] Congress expressly amended the ADEA to provide for limited extraterritorial application. *Denty v. SmithKline Beecham Corp.*, 109

---

[13]Parenthetically, we mention, without deciding, that a convincing argument can be made that Brinson's and Crabtree's "work station" was in Canada, not the United States. As noted earlier, Asplundh does not require its employees to travel outside of their locality for emergency cleanup work. Instead, it seeks volunteers. Therefore, Brinson and Crabtree were not sent to Ottawa in the regular course of their employment. In addition, as noted in n.2, *supra*, the volunteers were not covered by the collective bargaining agreeement between IBEW Local 171 and Asplundh while on assignment in Ottawa.

[14]We held that the ADEA did not operate outside the confines in the United States in *Cleary v. United States Lines, Inc.*, 728 F.2d 607 (3d Cir. 1984).

15

F.3d 147, 150 & n.2 (3d Cir. 1997) (citing cases). In 1991, following the Supreme Court's decision in *ARAMCO*, Congress amended both Title VII and the Americans with Disabilities Act to similarly provide for limited extraterritorial application. *See Torrico v. International Business Machines Corp.*, 213 F.Supp.2d 390, 399 (S.D. N.Y. 2002). However, Congress has never amended the NLRA to provide for extraterritorial application under any circumstances despite the Court's decision in *McCulloch* over 40 years ago expressly limiting the territorial reach of the NLRA.

## IV. CONCLUSION

Despite the broad "boilerplate" definitions in the NLRA, we can discover no cleary expressed congressional intention that that Act was intended to apply to employees working temporarily outside of the United States for United States employers. Therefore, we hold the Board did not have jurisdiction over the unfair labor practices charge here. Accordingly, we will vacate the Board's decision and dismiss the petition for review and cross-application for enforcement.[15, 16]

---

[15]Because of our holding, we need not determine whether Asplundh violated § 8(a)(1) of the NLRA.

[16] As we have noted throughout our discussion, the Board's position that the employees here should be afforded the protection of the NLRA given the temporary and limited nature of their assignment is not without force. Extraterritorial application of the NLRA here certainly does not appear to create the potential for international discord that was so evident from the circumstances in *McCulloch*. There, recognition of the union by the NLRB would have created a direct conflict with the Honduran Labor Code that recognized Sociedad as the sole Honduran bargaining agent. *McCulloch*, 372 U.S. at 20. The facts thus presented "[t]he presence of highly charged international circumstances," which raised the potential of construing the laws of the United States in a manner that might "violate the law of nations[]" absent a contrary interpretation. *Id*. at 21.

Moreover, *McCulloch* was based in large part upon the Court's prior decision in *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138 (1957). That case involved the Labor Management Relations Act of 1947 ("LMRA") and raised the specter of applying the labor law of the United States to a "controversy involving damages resulting from the picketing of a foreign ship operated entirely by foreign seamen under foreign articles while the vessel [was] temporarily in an American port." *Id*., at 139. Those two cases have, in turn, furnished the foundation for many of the extraterritorial disputes that followed. *See Spector v. Norwegian Cruise Line, Ltd*. *supra* generally for a discussion of the cases arising from *Benz*, *McCulloch*, and *ARAMCO*.

16

The presumption against extraterritorial application of congressional enactments is, in large measure, based upon the notion that legislation is nearly always enacted in response to domestic concerns. *See Smith v. United States*, 507 U.S. 197, 204 n.5 ("[T]he presumption is rooted in a number of considerations, not the least of which is the commonsense notion that Congress generally legislates with domestic concerns in mind."). The difficulties we have already discussed with an *ad hoc* approach to these difficult issues certainly mitigates against creating exceptions to the extraterritorial reach of the NLRA to accommodate the kind of dispute before us here. However, given the seemingly incongruous result we believe the text of the NLRA and prior decisions require, Congress can amend the NLRA to extend its protections to these kinds of work assignments if that is what it intended. However, given the current wording of the NLRA, "the [NLRB's] arguments should be directed to Congress rather than to us." *McCulloch*, 372 U.S. at 22.

17